**P.R. HALL, Plaintiff,**

v.

**LOWDER REALTY CO., INC., et al., Defendants.**

**No. Civ.A. 97–T–1382–N.**

United States District Court, M.D. Alabama, Northern Division.

June 29, 2001.

Elaine R. Jones, Norman J. Chachkin, New York City, Leslie Proll, Reed N. Colfax, Washington, DC, Samuel Fisher, Gordon, Siberman, Wiggins & Childs, Birmingham, AL, for Plaintiff.

Frances Heidt, Fern Singer, Marion F. Walker, Berkowitz Lefkovits, Isom & Kushner, Birmingham, AL, Christopher J. Willis, Rogers & Hardin, LLP, Atlanta, GA, Charles A. Stewart, III, Bradley Arant Rose & White, LLP, Montgomery, AL, Gail Crummie Washington, Birmingham, AL, David R. Boyd, Robin Garrett Laurie, Balch & Bingham, Montgomery, AL, for Defendants.

## ORDER

MYRON H. THOMPSON, District Judge.

Plaintiff P.R. Hall, an African–American real-estate agent, brings this action alleging that her former employer engaged in racially discriminatory referral practices and retaliated against her and terminated her for opposing discrimination and because of her race. She names as defendants Lowder Realty Company, Inc., Lowder New Homes, Inc., Lowder New Homes Sales, Inc., Colonial Company, James K. Lowder, Jerry Wills, Fraser Sparkman, John Dorough, Jr., Barbara Bonds, and Warren Stafford.[1] She proceeds under the Fair Housing Act of 1968 (FHA) (42 U.S.C.A. §§ 3601 through 3631 (specifically § 3604, subsections (a) through (c), §§ 3605, 3606, and 3617)) and the Civil Rights Act of 1866 (42 U.S.C.A. § 1981),[2] and she seeks declaratory and injunctive relief and compensatory and punitive damages. She has properly invoked the jurisdiction of this court under 28 U.S.C.A. §§ 1331 (federal question) and 1343(a)(4) (civil rights) and 42 U.S.C.A. § 3613(a)(1)(A) (FHA).

This lawsuit is now before the court on the motion for summary judgment filed by defendants. At this time, the court will determine only whether Hall can proceed with any of her substantive claims, and will address the arguments regarding the liability of the various defendants as to those claims in a forthcoming opinion. For reasons to follow, the court will deny the motion in part and grant it in part.

---

1. Hall also named Coldwell Banker Residential Associates, Inc. and Coldwell Banker Real Estate Corporation as defendants. Hall and the Coldwell defendants, however, stipulated to a dismissal of all claims against these two defendants.

2. Hall initially sought relief under 42 U.S.C.A. § 3604(d) and 42 U.S.C.A. § 1982 as well. She has informed the court that she no longer wishes to pursue those claims.

## I. SUMMARY–JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the non-movant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or non-movant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. FACTUAL SUMMARY

The facts, as garnered from the affidavits, deposition testimony, and other evidence submitted by the parties but viewed in the light most favorable to the plaintiff, are as follows. On or about January 1993, Hall began working for Lowder Realty, a residential real-estate company in Montgomery, Alabama, as a residential real-estate agent.[3] She was recruited by Jerry Wills, who at that time was the president and broker of Lowder Realty.[4] Wills reports that he been trying to recruit her for several years before she agreed to come to Lowder Realty. When Wills recruited her, he asked her to work in Meadowalk, a predominantly African–American subdivision.[5] Hall soon became one of Lowder Realty's top producers.[6] In the years 1994 through 1996, Lowder Realty awarded her "Top Sales Associate."[7]

Defendants are related to each other as follows:

● Lowder Realty is a wholly owned subsidiary of Colonial Company, as is Lowder New Homes.

● Lowder New Homes owns real-estate developments in the Montgomery, Alabama area, and Lowder New Homes Sales is a subsidiary of Lowder New Homes.

● James K. Lowder is the president of Colonial Company.

● Barbara Bonds is the president of Lowder New Homes Sales.

● Warren Stafford is sales manager for Lowder New Homes.

● Fraser Sparkman is the qualifying broker for Lowder Realty.

---

**3.** Lowder-related defendants' evidentiary submission relating to their memorandum of law in support of motion for summary judgment, filed November 30, 1998 (hereafter "Lowder defendants' evidentiary submission"), exhibit A (deposition of Pearl Regina Hall) at 18.

**4.** *Id.* at 19; *id.*, exhibit B (deposition of John W. Dorough, Jr.) at 106–07, and exhibit C (deposition of Jerry Wills) at 189–90.

**5.** *Id.*, exhibit A (deposition of Pearl Regina Hall) at 19. Defendants contend that Wills also asked D'Ann Binford, a white agent, to work in Meadowalk. However, the court has found no evidentiary support for this contention in the record.

**6.** Plaintiff's response in opposition to Lowder defendants' motion for summary judgment, filed January 8, 1999 (hereafter "Plaintiff's response"), exhibit 5, (deposition of Jerry Wills) (hereafter "Wills deposition") at 364.

**7.** Plaintiff's response, exhibit 2 (deposition of Pearl Regina Hall) (hereafter "Hall deposition") at 458.

• Jerry Wills was the president and broker of Lowder Realty at the time Hall was hired.

• In March 1996, John W. Dorough, Jr. became general manager of Lowder Realty.[8]

## A. REFERRALS

Lowder Realty has a department, called the Relocation Department, dedicated to assigning third-party referrals of customers to agents. The Relocation Department handles two main types of referrals: buyer referrals and listing referrals. A listing referral occurs when a person who wants to sell his or her Montgomery area home is referred to an agent for assistance in selling the home; a buyer referral occurs when an individual who is moving to the Montgomery area is referred to an agent for assistance in buying a home.[9]

During the time Hall was at Lowder Realty, there were no fixed procedures for distributing referrals among Lowder agents. The policy manual left the decision to the discretion of the Relocation Director, who was Denise Haviland during the relevant period. The policy manual states:

"It is vital for the Director to manage referral assignments in a way that improves the chances of a successful transaction, since closings breed more referrals for Associates to work. This makes it necessary to match a lead to an Associate who has a good track record in marketing a particular type of property or working with customers in certain areas or price ranges. To do this requires some variation from a next-up routine." [10]

Hall received training that qualified her to receive all referrals, including the most sophisticated referrals.[11] However, Hall received only two buyer referrals during her tenure at Lowder Realty: Nicole Washington and Ted Bagley, both of whom are African–American.[12] When Haviland referred Washington to Hall, Haviland told Hall that Washington "need[ed] to work with a very strong black person, because her husband was a judge with the EEOC" and "Washington was a strong black woman." [13] Hall replied that "regardless of the reason for handing [her] the referral, [she] would take them to the closing table." [14]

Most of the listing referrals Hall received were in Area Five, a predominantly African–American area of town.[15] Hall es-

8. Lowder defendants' evidentiary submission, exhibit B (deposition of John W. Dorough, Jr.) at 106–07, 146.

Wills testified that after Dorough became general manager, Hall "made it clear that she wasn't going to follow any direction from anybody" but Wills. Lowder defendants' evidentiary submission, exhibit C (deposition of Jerry Wills) at 192. However, his testimony does not indicate whether Hall said that to him or whether he reached that conclusion on his own. On summary judgment, the court interprets evidence in the light most favorable to the nonmoving party; therefore, the court will interpret this evidence as Wills's conclusion. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir.1997) ("conclusory assertions . . ., in the absence of supporting evidence, are insufficient" to establish material facts on summary judgment).

9. Hall Deposition at 396.

10. Plaintiff's response, exhibit 28 (Coldwell Banker Lowder Realty Policy and Procedures Manual) at 52.

11. Hall deposition at 98–101.

12. *Id.* at 398.

13. *Id.* at 437–38.

14. *Id.* at 438.

15. *Id.* at 417. In her deposition, Hall described all of the listing referrals she could recall by location. The court has compared the locations with a map, provided by the parties, that delineates Area Five, and con-

timates that the population of Area Five is approximately 85 % African–American.[16] Hall also received referrals of home-sellers in Area Five from Wills.[17] Charlie Baker, a client whom Wills referred, told Hall that Wills had informed him she was "the expert in the area." [18]

Hall complained to Haviland on a number of occasions about receiving referrals on the basis of race.[19] In February 1997, Hall asked Haviland for referrals in areas other than Area Five and Haviland told her that she would receive the next referral outside of Area Five.[20] Hall never received another referral from Haviland.[21] Hall also complained to Wills, Lowder, and Dorough about the apparent belief in the company that she could sell property in only Area Five. She complained to Lowder and Dorough on or about May 16, 1997, less than a week before her termination.[22]

Certain agents received more referrals than others. Becky Westbrook, a white agent, received more third-party referrals than other agents did, as did Jere White-house and Jean Davis (who is an African–American).[23] Westbrook told Hall that in one year she had received 13 or 14 referrals, a number which astounded Hall.[24] Westbrook received listing referrals all over Montgomery, and, in 1997, Westbrook received 25 % of her business from referrals.[25] Hall also concluded that another white agent, Gerald Phillips, received more referrals than she did because, when it was announced that the referral policy would change, he said that he feared he would be put on probation for not selling enough.[26] Dorough also confirmed that Westbrook and another white agent, Diane Wolf, relied on referrals from Haviland for much of their business.[27]

## B. OTHER COMPLAINTS REGARDING DISCRIMINATION

In 1996, Hall complained to defendants about racially discriminatory treatment of the following three customers:

• *Rosemary Elebash:* In 1996, Hall listed the home of Brian and Rosemary Elebash, which was located in the Normandale section of Montgomery.[28] Hall contends

firmed that all but one referral was in Area Five. *See id.* at 394–433; Lowder defendants' supplemental evidence per court request, filed March 18, 1999. The only listing referral not in Area Five was near the airport and owned by and sold to African–Americans. *See* Hall deposition at 406–07.

16. *Id.* at 404–05.

17. *Id.* at 420.

18. *Id.* at 415. Because this statement is hearsay, Baker will have to testify to the statement at trial for it to be admissible; but, even without it, summary judgment is still inappropriate.

Also, Hall contends that a number of clients told her that Wills had said she was the expert in the area or the "queen of southeast Montgomery." However, she has not provided the names of anyone else who allegedly reported this to her. Therefore, the court cannot consider the allegations.

19. *Id.* at 394–95.

20. *Id.* at 432–33.

21. *Id.* at 432.

22. *Id.* at 456–57.

23. Haviland deposition at 128. It is unclear how many were buyer referrals and how many were listing referrals.

24. Hall deposition at 467–68.

25. Plaintiff's opposition, exhibit 16 (deposition Becky Westbrook) at 69.

26. Hall deposition at 468–71.

27. Dorough deposition at 62–63.

28. Hall deposition at 234, 241–42.

that she received a call from Rosemary Elebash complaining that Lowder Realty agent Arthur Leslie had encouraged the Elebashes' neighbors to sell their house at a relatively low amount because African-Americans were moving into the area.[29] Hall reported the complaint to Dorough, who was general manager of Lowder Realty at the time.[30] She told Dorough that he should talk to the agent and to Rosemary Elebash about the incident.[31]

• *Barbara Gill–Smith:* In the summer of 1996, Hall was representing Barbara Gill–Smith and Ezell Smith, an African-American couple, in the sale of their home.[32] Hall suggested that Gill–Smith consider purchasing a new home in Young Farm and Bellwood West, both Lowder New Homes subdivisions.[33] Hall believes that Young Farm is predominantly white.[34]

On July 17, 1996, Gill–Smith visited Young Farm with a friend. She later paged Hall. When Hall spoke with her, Gill–Smith was hysterical and upset. Gill–Smith told her that when she asked for the price of a home, the agent on duty at Young Farm, who was white and knew nothing about Gill–Smith's finances, told her she could not afford it.[35]

Hall encouraged Gill–Smith to complain and provided her with the telephone numbers for Lowder, Wills, and Dorough.[36]

Hall also directly reported the incident to a number of people associated with defendants. First, she reported the incident to Dorough and recommended that he call Gill–Smith and also see that the agent is terminated.[37]

Hall next reported the incident to Jill Wilson, Young Farm's on-site representative, and asked her which agent was on duty on the day of the incident.[38] Because Wilson claimed not to know who was working on that day, Hall visited another Lowder New Homes subdivision, informed an agent there of the incident, and obtained the name from the New Homes agent there.[39] Hall also reported the incident to Barbara Bonds, then vice-president of Lowder New Homes Sales, and asked Bonds to have a meeting with the Gill–Smiths.[40] Finally, Hall informed Wills, then the broker at Lowder New Homes Sales, told him she had spoken with Bonds about it, and gave him Gill–Smith's address and telephone numbers.[41] James Lowder learned of the complaint from Bonds at a Lowder New Homes sales meeting shortly after the incident occurred.[42] At some point, he also learned that Hall had reported the complaint to Dorough.[43]

• *Nicole Washington:* In 1996, Hall assisted Nicole Washington, an African-

---

29. *Id.* at 235, 245, 260.

30. *Id.* at 255–56.

31. *Id.* at 235–36.

32. *Id.* at 264, 276.

33. *Id.* at 265.

34. *Id.* at 354.

35. *Id.* at 258; Plaintiff's opposition, exhibits 17 (ethics complaint from Barbara Gill–Smith), 19 (ethics complaint from Denise Frazier), and 20 (ethics complaint file from Montgomery Area Association of Realtors).

36. *Id.* at 261.

37. *Id.* at 259–60.

38. *Id.* at 280, 196.

39. *Id.* at 260–61, 280–81, 287.

40. *Id.* at 261–63.

41. *Id.* at 279.

42. Lowder Deposition at 493, 495.

43. *Id.* at 600.

American, with purchasing a home at Young Farm in Montgomery.[44] After Washington had purchased the home but before she had closed on it, she contacted Hall to complain about treatment she received from Young Farm representative Jill Wilson during a visit to Young Farm. Hall claims that Washington was upset because, when Washington told Wilson that she wanted to install vinyl flooring instead of tile in the master-bathroom floor, Wilson told Washington that she was "destroying the integrity of the neighborhood."[45]

Hall perceived the treatment as racist and reported it to Bonds.[46] Hall told Bonds that this was the second time Hall had worked with an African–American female who had been insulted at Young Farm and that she expected Bonds to correct the situation as soon as possible. Bonds offered to remove Wilson from the sale.[47] Hall thereafter also reported the incident to Wills and told him that she resented that the only action taken was removing Wilson from the sale. Finally, Hall reported Washington's complaint to Haviland.[48] Haviland responded that "it was stupid for [Wilson] to make a statement like that since [Washington's husband] used to be affiliated with the EEOC."[49]

## C. EVENTS LEADING UP TO TERMINATION

On December 31, 1996, Hall learned from Helen Herdon, an employee of the Colonial Company,[50] that a rumor was circulating that Hall had dropped in production from number two to number three.[51] Hall and Herndon then calculated Hall's total production, which they found to be $ 4.1 million.[52] In early January 1997, Hall furnished Dorough with this information.[53]

Lowder Realty held an annual awards luncheon on February 21, 1997.[54] At the luncheon, Dorough presented Hall with an award for being a top producer but misstated her total sales as $ 3.4 million instead of $ 4.1 million.[55] Believing that Dorough knew the correct amount, Hall interpreted his error as an intentional slight and did not go up to the podium to receive the award, remaining seated at her table instead.[56] Dorough went over and placed the award on the table. The next day, Dorough put a computer printout in every employee's box showing the correct production of every agent. Hall interpreted this as an apology.[57]

Immediately after the awards ceremony, Hall experienced a drop in the number of telephone calls she received in the office. The telephone calls would have come to the Lowder Realty office receptionist from

44. Hall Deposition at 437–38.

45. *Id.* at 316.

46. *Id.*

47. *Id.* at 336–37.

48. *Id.* at 383–85.

49. *Id.* at 383.

50. Plaintiff's response to additional evidence submitted by defendants Lowder Realty et al., filed February 19, 1999, attachment (deposition of Helen Herndon) at 11.

51. Hall deposition at 570.

52. *Id.* at 570–71.

53. *Id.* at 231.

54. *Id.* at 583.

55. *Id.* at 591.

56. *Id.* at 231, 591, 599.

57. *Id.* at 588.

potential clients who had received Hall's flier or seen her advertisements. Hall complained to Warren Stafford in late March that she "felt like she wasn't in business."[58] He told her that he thought that if she "would attend sales meetings, [it] would stop all of this" because she and Dorough had not spoken since the awards ceremony.[59]

On March 31, 1997, the Central Alabama Fair Housing Center (CAFHC) and others filed a lawsuit against Lowder Realty, Colonial Company, Lowder New Homes, James Lowder, Jerry Wills, and Fraser Sparkman, claiming housing discrimination on the basis of race. Gill–Smith was involved in the case.

In early April, Hall again complained to Stafford about the lack of calls, and he again asked her to come to a sales meeting. She did attend, and her calls immediately started back at a rate of approximately 20 calls per day.[60]

On May 16, 1997, Hall and several other agents met with Fern Singer, an attorney representing Lowder Realty in the CAFHC case.[61] When Singer asked whether discrimination started at the top of the company, Hall told her that she had no comment. Singer asked her whether she felt the agents practiced racial steering or discriminated in any way, and Hall replied that most of the agents come from small towns, that "this is the South," and

that "a lot of those agents bring with them those prejudices and stereotypical attitudes that they brought with them from small towns, and they pass those prejudices and attitudes along to the public."[62] Lowder and Dorough both contend that neither Singer nor anyone from her law firm told them what Hall said in that conversation.[63]

On or about the same day, Lowder and Dorough informed Hall that the relocation referral policy was changing. She responded that it did not matter to her because she received so little business from referrals anyway. She told Lowder and Dorough that the company seemed to believe she could not sell property outside of Area Five and that she only received referrals in areas in which the homeowners were predominantly African–American.[64]

On May 21, 1997, Lowder called a meeting and announced at the outset that he had named Dorough president of Lowder Realty. It is undisputed that there ensued a conversation in which more than one person expressed dissatisfaction with the decision.[65] Hall asked Lowder to confirm that Dorough would serve as president and general manager. When he did, Hall got up from the table, left the room, said nothing further, and did not return.[66] Hall admittedly left the meeting "to convey that ... [the decision] was ridiculous" given Dorough's "ineffective[ness] as a General Manager."[67]

58. *Id.* at 232.

59. *Id.*

60. *Id.*

61. *Id.* at 613.

62. *Id.* at 613.

63. Lowder Defendants' Evidentiary Submission, exhibit 7 (Declaration of James K. Lowder) at ¶ 5, and exhibit 8 (declaration of John W. Dorough, Jr.) at ¶ 4.

64. Hall deposition at 456, 463.

65. Lowder Defendants' Evidentiary Submission, exhibit D (deposition of James K. Lowder) (hereafter "Lowder Deposition") at 610.

66. Hall Deposition at 483–84.

67. Hall Deposition at 484–85. Lowder contends that when he told her that Dorough would remain the head of Lowder Realty, she said, "I'm not going to have it. I'm out of here"; and then she left. Lowder deposition at 610–11. However, because the matter is before the court on a motion for summary judgment, where the evidence conflicts the court must view it in the light most favorable

On May 22, 1998, Dorough, Sparkman, and Haviland, following instructions from James Lowder, met with Hall and terminated her contract. Hall claims that Dorough also threatened to terminate her real-estate license.[68] Because Hall obtained employment with Aronov Realty almost immediately thereafter, her real-estate license was transferred instead of terminated. Lowder Realty stopped Hall from taking several listings with her to her new job, terminated her from the progressive commission split program, with the result that she was forced to pay Lowder Realty higher commissions on the sales she had pending than she otherwise would have, charged her new company referral fees which also cut into her commissions, and refused to give her a customer list she had been developing over her years as an agent and used to cultivate business.[69]

## III. DISCUSSION

Defendants raise numerous grounds for summary judgment. First, they contend that Hall lacks standing to raise claims under §§ 3604, 3605 and 3606 of the FHA and § 1981. Second, they contend that Hall cannot establish a prima-facie case under the FHA or the Civil Rights Act. Finally, they contend that, even if she can prove a prima-facie case, she cannot provide sufficient circumstantial evidence of discrimination to prevail on her claims. In addition, defendants contend that, as to various issues, this court's decision is controlled by the decisions in the CAFHC case.

## A. STANDING

■ As noted above, defendants challenge Hall's standing to pursue claims under §§ 3604, 3605, and 3606 of the FHA and 42 U.S.C.A. § 1981. "Federal courts have divided the standing doctrine into a two-tiered framework comprised of (1) minimum constitutional requirements for cases and controversies and (2) prudential considerations that limit the exercise of jurisdiction in certain actions." *Jackson v. Okaloosa County, Fla.,* 21 F.3d 1531, 1537 (11th Cir.1994). "There are three minimum constitutional requirements for standing: (1) the plaintiff must allege an actual or imminent injury; (2) the injury must be traceable to the alleged unlawful conduct; and (3) the relief requested must be likely to remedy the plaintiff's injury." *Id.* The 'prudential' limitations placed upon the exercise of federal jurisdiction include: "[(1)] the principle that federal courts should avoid deciding generalized grievances that present abstract questions of wide public significance, [(2)] the requirement that the plaintiff's complaint be within the zone of interests protected by the statute or constitutional guarantee at issue, and [(3)] the requirement that a plaintiff ... assert his own legal rights and interests, not the rights of third parties." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1376 (11th Cir.1997). "Congressional legislation, however, may expand standing to the full extent permitted by Article III, thus proscribing the judicial exercise of prudential considerations." *Id.* (citing *Gladstone, Re-*

to the plaintiff. The court accordingly will assume Hall's version of events to be correct.

**68.** Hall also notes that Lowder Realty has no African-American salaried employees although it does have African-American real-estate agents. At least during the period that Hall was at Lowder Realty, Lowder New Homes did not have an African-American on-site representative. Hall sought to have Jean

Davis, an African-American agent, become an on-site representative with Lowder New Homes. Davis was offered a non-commissioned job as a floater and turned it down because she wanted a commissioned job. The court does not see how this is probative of Hall's claims in this case.

**69.** Plaintiff's opposition, exhibit 1 (declaration of P.R. Hall) at 2–4.

*altors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)).

■■■ Any "aggrieved person" can bring an action under the FHA. 42 U.S.C.A. § 3613(a)(1)(A). The FHA defines an aggrieved person as anyone who "claims to have been injured by a discriminatory housing practice," 42 U.S.C.A. § 3602(i)(1), and defines a "discriminatory housing practice" as any act that is unlawful under §§ 3604, 3605, 3606, or 3617. 42 U.S.C.A. § 3602(f). The FHA's definition of aggrieved person confers standing as broadly as is permitted by Article III of the Constitution. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982); *Gladstone, Realtors,* 441 U.S. at 100, 99 S.Ct. at 1608; *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972). Therefore, standing under the FHA "is not limited by prudential concerns but is satisfied by the minimum constitutional 'case or controversy' requirement of Article III." *Baytree of Inverrary Realty Partners v. City of Lauderhill,* 873 F.2d 1407, 1409 (11th Cir.1989) (citing *Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982)). *See also* Robert G. Schwemm, *Housing Discrimination: Law and Litigation* (hereafter "Schwemm") § 12.2(2) (1998) (citing *Gladstone, Realtors,* 441 U.S. at 103–04 n. 9, 99 S.Ct. at 1609–10 n. 9) ("[A]nyone may sue who is 'genuinely injured by conduct that violates someone's ... rights' under Title VIII.") However, prudential limitations on standing do apply to actions under § 1981. *See Warth v. Seldin,* 422 U.S. 490, 513–14, 95 S.Ct. 2197, 2212–13, 45 L.Ed.2d 343 (1975).

The court will apply these concepts to each of the challenged claims below.

## B. PROOF IN FAIR HOUSING ACT AND § 1981 CASES

■■■ In both FHA and § 1981 cases, courts apply the methods of analysis developed for use in cases under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989) (§ 1981); *Secretary, United States Dep't of Housing and Urban Development v. Blackwell,* 908 F.2d 864 (11th Cir.1990) (FHA). Under this approach, a plaintiff may present either direct evidence of discriminatory or retaliatory intent, manifested by the actions or remarks of the defendant, or use the factors set forth in burden-shifting analysis developed by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to raise, by indirect or circumstantial evidence, an inference of discrimination. *See Hill v. Metropolitan Atlanta Rapid Transit Authority,* 841 F.2d 1533, 1538 (11th Cir.1988); *see also Turnes v. AmSouth Bank, NA,* 36 F.3d 1057, 1060–1061 (11th Cir.1994); *Howard v. BP Oil Co.,* 32 F.3d 520, 524 n. 2 (11th Cir.1994). The burdens imposed on the parties differ depending on which method is employed. If the plaintiff succeeds in presenting direct evidence that discrimination "played a significant or substantial role in the [challenged] decision, the burden shifts to the [defendant] to show that the decision would have been the same absent discrimination." *Eskra v. Provident Life & Acc. Ins. Co.,* 125 F.3d 1406, 1411 (11th Cir. 1997). If, however, no direct evidence of discrimination is shown, and the plaintiff must rely upon circumstantial evidence, she retains the ultimate burden of proving that she was the victim of intentional discrimination. *See Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 963 (11th Cir. 1997).

 When a plaintiff seeks to prove discrimination through circumstantial evidence, her claims must be analyzed under the Supreme Court's burden-shifting framework for the presentation of proof in Title–VII discrimination cases, as set out in *McDonnell Douglas.* Under this approach, a plaintiff has the initial burden of proving a prima-facie case of unlawful discrimination by a preponderance of the evidence. *See* 411 U.S. at 802, 93 S.Ct. at 1824. Many different articulations of the prima-facie case exist, varying with the context of the decision at issue and the types of proscribed practices involved. The essence of the prima-facie case is that the plaintiff presents circumstantial evidence sufficient to generate a reasonable inference by the fact-finder that the defendant used prohibited criteria in making a decision or taking action affecting the plaintiff. If established, the prima-facie case raises a presumption that the defendant is liable to the plaintiff. *See id.; Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

 Once the plaintiff has established a prima-facie case, the defendant must rebut the presumption of discrimination established by producing sufficient evidence to raise a genuine issue of fact as to whether the defendant took unlawful actions against the plaintiff, a burden that can be met by articulating a legitimate, nondiscriminatory reason for the challenged action. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997), *cert. denied,* 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). The rebuttal burden is one of production only, and the defendant does not have to persuade the court that it was actually motivated by the proffered reason. *See Burdine,* 450 U.S. at 253–55, 101 S.Ct. at 1093–94.

 If the defendant satisfies this burden, "the presumption of discrimination created by the *McDonnell Douglas* framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'" *Combs,* 106 F.3d at 1528 (quoting *Burdine,* 450 U.S. at 255 & n. 10, 101 S.Ct. at 1094–95 & n. 10). Specifically, the burden again shifts to the plaintiff to show that the proffered reason is a pretext for the true discriminatory or retaliatory reason. "To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision." *Walker v. NationsBank of Florida N.A.,* 53 F.3d 1548, 1564 (11th Cir.1995) (Johnson, J., concurring) (discussed with approval in *Combs,* 106 F.3d at 1531).

## C. DISCRIMINATORY–REFERRAL CLAIMS

Hall brings a number of claims related to defendants' alleged practice of making certain types of referrals on the basis of race. She brings these claims under §§ 3606, 3605, and 3604(b) of the FHA as well as § 1981.

### 1. Section 3606

Section 3606 of the FHA prohibits "deny[ing] any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling ... dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C.A. § 3606. Hall contends that defendants violated this provision by referring African–American clients to her on

account of race and assigning her listing referrals in only predominantly African–American areas of Montgomery. The court finds that summary judgment on this claim is inappropriate.

Section 3606 provides broad protection against discrimination on the basis of race in the terms or conditions of participation in any "service, organization, or facility relating to the business of selling . . . dwellings." The Department of Housing and Urban Development (HUD) regulations interpreting § 3606 list among actions prohibited by the provision: "Denying or limiting benefits accruing to members in a real estate brokers' organization because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.90(b)(2). Therefore, to the extent Hall can show that she was limited in the referrals she received on account of race, she can proceed under this section.

As a preliminary matter, the court will address two of defendants' arguments. First, defendants argue that Hall cannot establish any injury redressable under this provision and she therefore lacks standing because, while at Lowder Realty, Hall won awards for being a top producer and because Dorough helped set up an advertising fund to help her establish a mail-out campaign. Hall's success in selling real estate and defendants' provision of advertising funds to her does not prove that she was not injured by any actions in violation of § 3606. If Hall was limited to referrals of African–American customers or African–American neighborhoods, her success likely would have been limited by that restriction. Her success in spite of this alleged illegal activity does not eviscerate her standing. Likewise, Dorough's establishment of an advertising fund to help Hall reach African–American clientele does not cancel out any injury she may

have suffered as a result of discriminatory referral practices.

■■■■■ Defendants also contend that, in the CAFHC case, the jury determined that defendants did not engage in "the exact same discriminatory housing practices made the basis of [Hall's] claims here"[70] and that her claim is therefore barred by collateral estoppel. The party asserting collateral estoppel bears the burden of proving its application, and, for collateral estoppel to apply, three prerequisites must be shown: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action. *Mike Smith Pontiac, GMC, Inc. v. Mercedes–Benz of North America, Inc.*, 32 F.3d 528, 532 (11th Cir.1994). Defendants have failed to meet their burden of showing that collateral estoppel applies. They have not provided any evidence to demonstrate that the court in the CAFHC case decided whether Lowder Realty engaged in discriminatory referral practices. Moreover, it appears that the final jury decision in the CAFHC case has been overturned. *See Central Ala. Fair Housing Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629 (11th Cir.2000).

■■■■■ Defendants claim that Hall cannot prove a prima-facie case of discrimination under § 3606. Hall contends that she has presented direct evidence that she suffered discrimination under § 3606. "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998). To con-

70. Memorandum of Law at 4.

stitute direct evidence of discrimination, the remarks must have been made by the decision-maker in a challenged decision. *See Zaben v. Air Products & Chemicals, Inc.,* 129 F.3d 1453, 1456 (11th Cir.1997). Hall's evidence that Haviland stated that she referred Washington to Hall because Washington was "a strong black woman" whose husband was a judge with the EEOC and "need[ed] to work with a strong black agent" is direct evidence that Haviland referred Washington to Hall on account of race. This evidence is also sufficient for a jury to conclude that the Washington referral was made on the basis of race. Therefore, the court will deny summary judgment as to the claim that defendants violated § 3606 in the Washington referral. *See Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir. 1997) ("Where the non-movant presents direct evidence [of discrimination] that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence.") (citing *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996)); *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641 (11th Cir.1998).

However, the direct evidence regarding Washington is not sufficient for the jury to conclude that Haviland made all referrals to Hall on account of race. As to the broader claim, Hall presents only circumstantial evidence.

▮ Under the *McDonnell Douglas* approach, Hall must first establish a prima-facie case of housing discrimination. The court is not aware of any published

opinion formulating the standards applicable to a prima-facie case for a similar violation of § 3606.[71] Therefore, the court must formulate an appropriate standard under § 3606. The court finds that, to prove a prima-facie case of discriminatory referrals under § 3606, Hall must show that: (1) she is a member of a protected class; (2) she was qualified to participate in a business related to the buying or selling of houses; (3) she received either a limited number of referrals, referrals of people who were members of her protected class, or referrals of home-sellers in neighborhoods predominantly populated by members of her protected class; and (4) others not in her protected class received more referrals, referrals of clients not in her protected class, or referrals in neighborhoods that are not predominantly populated by members of her protected class.

▮ Hall has presented evidence that she is African–American, highly qualified as a real-estate agent, and qualified by training to receive third-party referrals. Hall has presented evidence that a white agent, Westbrook, received more referrals than she did during at least one year.[72] Therefore, Hall has a established a prima-facie case of discrimination in the number of referrals received.

▮ Hall also has established a prima-facie case that she received referrals on the basis of race. Hall testified that she received almost all of her listing referrals in Area Five and that Area Five is a predominantly African–American part of Montgomery.[73] She has also produced evi-

---

**71.** Indeed, there is very little case law interpreting § 3606 at all.

**72.** Hall has also testified that Phillips received more referrals than she did and that African–American agents as a group received fewer referrals than white agents. However, the record does not indicate that she has actual

knowledge of the number of referrals received by Phillips or received by African–American and white agents.

**73.** She also testified that, while not all of her sellers in Area Five were African–American, all of her buyers were.

dence that Westbrook, a white agent, received referrals "all over Montgomery."[74] Thus, Hall has established a prima-facie case of discrimination in referrals.

Therefore, as to the discriminatory-referral claim, the burden shifts to defendants to come forward with a legitimate, nondiscriminatory reason that rebuts the prima-facie case of discrimination. The defendant's burden is to "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's" treatment. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094. The defendant "must frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255–56, 101 S.Ct. at 1095.

Defendants have not produced evidence as to why Hall received only African–American and Area Five referrals or why she received fewer referrals than Westbrook. Defendants did refer to Haviland's testimony that she gave Hall the Washington referral because it was a "good" one. Haviland's explanation of why she referred Washington to Hall only rebuts her reason for referring Washington. (However, because Hall presented direct evidence as to the Washington claim, she need not show that this reason was pretextual.) Haviland's testimony does not provide a reason for the near-exclusive referrals of Area Five home-sellers to Hall or Westbrook's receipt of more referrals than Hall. Defendants also contend that Haviland denied making referrals on the basis of race.[75] However, the cited testimony does not con-

tain such a statement. Therefore, the court will deny summary judgment on Hall's discriminatory-referrals claims under § 3606.

In any case, there is a genuine issue of material fact as to whether the referrals process was discriminatory. The record indicates that the referrals process was a subjective one in which one person, Haviland, attempted to match customers with the agents she believed were most likely to sell them homes and/or sell their homes. While the use of a subjective process is not inherently discriminatory, *see Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), subjective processes provide a ready mechanism for discrimination. *See Harris v. Birmingham Bd. of Educ.,* 712 F.2d 1377, 1383 (11th Cir.1983); *Miles,* 750 F.2d at 871–72. Furthermore, Hall has presented evidence that Haviland admitted referring Washington to Hall on account of race. She also has presented evidence that defendants limited her referrals to an African–American area of Montgomery and referred only two out-of-town African–American buyers to her despite her rank as the number-two sales agent at Lowder Realty and the availability of referrals throughout Montgomery. Finally, she also presented evidence that Wills considered her the expert in Area Five, a belief that likely reflects the areas in which she received referrals.[76] Given Lowder Realty's policy of pairing customers with the agents most likely to make a sale in a given area, the perception of Hall as the

---

**74.** Defendants argue that Hall's argument with regard to Westbrook is "based totally on inadmissible hearsay." Lowder defendants' reply memorandum, filed January 22, 1999, at 9. However, Hall's argument is based not only on Hall's own testimony but also Westbrook's and Haviland's. Their testimony regarding the Westbrook's referrals was based on first-hand knowledge and is therefore not hearsay.

**75.** *See* Lowder defendants' reply brief at 8 n. 3.

**76.** This testimony is hearsay, and will have to be put forward in a non-hearsay form to be admissible at trial. But, even without it, summary judgment is still inappropriate.

expert in Area Five would have made it more likely that she would continue to receive referrals there.

■ This evidence also makes clear that Hall has standing to bring this claim. Hall has produced evidence that clients were available outside Area Five and she did not receive them. She has also produced evidence that she was a very successful real-estate agent who could have earned money had she been provided with additional referrals. This evidence is sufficient to survive summary judgment on the issue of whether she suffered an injury in fact caused by defendants' actions. Accordingly, the court will deny summary judgment on Hall's discriminatory-referral claim under § 3606.

### 2. Section 3605

Hall also asserts that defendants' alleged practice of making race-based referrals violates § 3605 of the FHA. Subsection (a) of § 3605 of the Fair Housing Act provides that, "It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C.A. § 3605(a). The statute defines the term "residential real estate-related transaction" to include "[t]he selling, brokering, or appraising of residential real property." 42 U.S.C.A. § 3605(b)(2). The HUD regulations interpreting this section prohibit discrimination "in the performance of" real-estate sales and brokering services. 24 C.F.R. § 100.135(a).

■ As discussed above, Hall has presented evidence that defendants discriminated in referrals by racially pairing clients with agents. Under the FHA, "[d]iscrimination based on intentional consideration of [race] ... is illegal, even if the defendant was not motivated by personal prejudice or racial animus." Schwemm § 10.2 at 10–5 (citing, *inter alia*, *United States v. Pelzer Realty Co.*, 484 F.2d 438, 443 (5th Cir.1973)). Therefore, racial matching of customers with agents clearly constitutes racial "discrimination" "in the performance of" real-estate sales services.

The evidence relevant to this claim and the analysis of the evidence is the same as Hall's claim under § 3606. Therefore, the court will deny summary judgment on this claim as well.

### 3. Section 3604(b)

Hall also brings a discriminatory-referral claim on behalf of her customers under § 3604(b) of the FHA. That section prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C.A. § 3604(b). "[S]ection 3604(b) protects the right to buy or rent without racial distinctions." *Grant v. Smith*, 574 F.2d 252, 255 (5th Cir.1978).[77] Hall contends that defendants violated this provision by referring African–American customers to agents on the basis of race.[78]

---

**77.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

**78.** Hall contends that defendants referred African–American customers to African–American agents because they hoped and expected that such agents would keep the customers in African–American neighborhoods. There is no support in the record for this allegation. However, Hall's ability to state a claim under § 3604(b) does not turn on defendants' motivation for assigning agents by race.

■ Referring a customer to an agent on the basis of race clearly constitutes discrimination in the provision of services related to the sale of a dwelling. As discussed earlier, to have standing under the FHA, Hall need only show that defendants violated an individual's rights under the FHA and that Hall was injured by the violation.

■ Although it is unclear, Hall seems to assert a § 3604(b) claim on behalf of all of her African–American customers. To establish a prima-facie case of that claim, she would have to show that her African–American clients were referred to her when qualified white agents were available. The evidence discussed above is sufficient to establish these facts. Furthermore, because Hall's right to receive referrals in a nondiscriminatory manner was injured by this practice, she can survive summary judgment on this claim.

### 4. Section 1981

Hall also alleges that defendants' alleged discriminatory referrals policy violates § 1981. "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts." *Ferrill v. The Parker Group, Inc.,* 168 F.3d 468, 472 (11th Cir.1999). In *Ferrill,* an employment-discrimination case, the Eleventh Circuit made clear that racial pairing of employees and customers, even in the absence of racial animus, violates § 1981. *Ferrill* involved an African–American plaintiff who sued for racial discrimination in part because she had been hired to make "get out the vote" calls to African–American voters. The defendant employer admitted that it had paired callers with voters on the basis of race when requested to do so by customers, but argued that because it had not acted with racial animus, it was not liable for racial discrimination. The Eleventh Circuit rejected this argument, holding that "a de-

fendant who acts with no racial animus but makes job assignments on the basis of race can be held liable for intentional discrimination under § 1981." *Id.* at 473. "In other words," the court explained, "ill will, enmity, or hostility are not prerequisites of intentional discrimination" under § 1981. *Id.* n. 7. *See also Goodman v. Lukens Steel Co.,* 482 U.S. 656, 669, 107 S.Ct. 2617, 2625, 96 L.Ed.2d 572 (1987) (liability for intentional discrimination under § 1981 requires only that decisions be premised on race, not that decisions be motivated by invidious hostility or animus).

■ As discussed above, Hall has presented evidence suggesting that defendants paired her with an African–American client and limited the referrals she received on the basis of race. This is clearly actionable under § 1981. Therefore, the court will deny summary judgment on this claim.

### D. SECTION 3604(A)

■ Hall contends that defendants violated § 3604(a) of the FHA, which prohibits "refus[als] to sell or rent after the making of a bona fide offer, or ... refus[als] to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C.A. § 3604(a). Section 3604(a) prohibits blatant refusals to rent or sell, *see, e.g., Secretary, United States Dep't of Housing and Urban Development v. Blackwell,* 908 F.2d 864 (11th Cir.1990), as well as actions that have the effect of limiting the availability of housing to members of protected classes. *See Jackson,* 21 F.3d at 1542 & n. 17 (citing cases).

Hall's theory under § 3604(a) is unclear. Hall argues that defendants' "express racial policies and the practices they applied to plaintiff as an African–American agent representing African–American clients vio-

late Section 3604(a)." [79] She further contends that "[t]he limitations imposed by defendants on the areas to which plaintiff could direct her African–American clients" are practices designed to make property unavailable on the basis of race. Finally, she posits that, "if defendants were referring African–American customers to African–American agents based on the expectation that such agents would keep such customers confined to African–American neighborhoods, then defendants were limiting the choices of those customers, [and] making housing in white areas unavailable." [80] Hall also seemingly argues that defendants' failure to report back to her regarding her three complaints of racially discriminatory or illegal conduct against her customers further signaled that she should keep her African–American clients out of predominantly white areas.

 Hall has not presented evidence sufficient to establish a claim under this section. Section 3604(a) prohibits practices that have the effect of making housing unavailable to members of protected classes. However, Hall has produced no evidence suggesting that, by pairing African–American customers with her, defendants made housing unavailable to those or any other customers. Indeed, Hall testified that she made a practice of showing her African–American customers homes in predominantly white neighborhoods if they so desired. Defendants surely knew that she did so; therefore, it is unlikely that they believed African–American customers assigned to Hall would not be shown homes in predominantly white neighborhoods. Nor has Hall shown that defendants limited the availability of housing for African–American customers by failing to report back to Hall on discrimination complaints. There is no evidence that by failing to report back to Hall defendants intended to communicate to her that she should keep her African–American clients out of white neighborhoods, and, more importantly, there is no evidence that Hall limited the choices of her African–American clients as a result of these actions. In sum, the court sees no support for Hall's theory that defendants engaged in a practice designed to make housing unavailable on the basis of race by assigning Hall to African–American clients and not reporting to her the results of her three complaints of discriminatory or illegal conduct. Therefore, the court will grant summary judgment on Hall's claim under § 3604(a).

### E. SECTION 3604(C)

Hall also brings a claim under § 3604(c) of the FHA, which prohibits making, printing, or publishing "any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination." 42 U.S.C.A. § 3604(c). The HUD regulations interpreting § 3604(c) provide that "[t]he prohibitions in this section shall apply to all written or oral notices or statements by a person engaged in the sale or rental of a dwelling." 24 C.F.R. § 100.75(b). Hall contends that Haviland violated § 3604(c) by telling her that the reason for the Washington referral was that Washington needed to work with a "strong black agent."

 The court has found no published opinion addressing the applicability of

**79.** Plaintiff's memorandum brief opposing motion for summary judgment by defendants Lowder Realty, et al., filed January 8, 1999, at 14.

**80.** Plaintiff's sur-reply to the reply brief of defendants Lowder Realty et al., filed February 5, 1999, at 9–10.

§ 3604(c) to a statement similar to the one challenged here. Haviland's statement does not fit within any of the examples of prohibited statements provided in the HUD regulations.[81] Nevertheless, the court finds Haviland's statement actionable under § 3604(c) under the plain language of the statute. Haviland "made" a statement "with respect to the sale ... of a dwelling" that indicated "discrimination" on the basis of race.

Hall has shown no emotional or financial injuries from this statement. Hall argues that she can demonstrate injury because "[t]he flip side to receiving a client because the agent and the client is African–American is that the African–American agent is not referred white clients, and thereby loses commissions because of race."[82] While Hall's statement explains why an agent may be injured by being paired with clients by race, it does not explain why a statement indicating the existence of such a practice causes such injury. Indeed, it appears that Hall's injuries stemmed from the practice of racial referrals, not from Haviland's statement. Although Hall presumably could claim emotional or stigmatic injuries from this statement, she has presented no evidence that she sustained any. However, Hall can still seek equitable relief. Therefore, the court will deny summary judgment on Hall's § 3604(c) claim.

## F. RETALIATORY AND DISCRIMINATORY TERMINATION, ETC. CLAIMS

Hall claims that she suffered a series of retaliatory and racially discriminatory employment acts, including termination of her employment. She brings these claims under §§ 3617 and 3606 of the FHA and 42 U.S.C.A. § 1981.

### 1. Section 3617

Section 3617 of the FHA provides that, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of[ ] any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C.A. § 3617.

Section 3617 has been interpreted to prohibit retaliation against employees who advocate for the fair-housing rights of others. The HUD regulations interpret § 3617 to prohibit "[t]hreatening an employee or agent with dismissal or an adverse employment action, or taking such adverse employment action, for any effort to assist a person seeking access to the sale or rental of a dwelling or seeking access to any residential real estate-related transaction, because of the race, color, religion, sex, handicap, familial status, or

---

**81.** The HUD regulations list the following as examples of "discriminatory notices, statements and advertisements:"

"(1) Using words, phrases, photographs, illustrations, symbols or forms which convey that dwellings are available or not available to a particular group of persons because of race, color, religion, sex, handicap, familial status, or national origin.

"(2) Expressing to agents, brokers, employees, prospective sellers or renters or any other persons a preference for or limitation on any purchaser or renter because of race, color, religion, sex, handicap, familial status, or national origin of such persons.

"(3) Selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin.

"(4) Refusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin."

24 C.F.R. § 100.75(c).

**82.** Plaintiff's Opposition at 16.

national origin of that person or of any person associated with that person." 24 C.F.R § 100.400(c)(3). The HUD regulations also provide as examples of actions violating § 3617 "[i]ntimidating or threatening any person because that person is . . . encouraging . . . other persons to exercise, rights granted or protected by this part," 24 C.F.R. § 100.400(c)(4), and "[r]etaliating against any person because that person has made a complaint . . . under the Fair Housing Act." 24 C.F.R. § 100.400(c)(5).

Courts also have recognized retaliation claims by employees under § 3617. In *Wilkey v. Pyramid Constr. Co.*, 619 F.Supp. 1453, 1454–55 (D.Conn.1985), for instance, a white employee of an apartment complex brought a claim under § 3617 alleging that she was fired for opposing her employer's discriminatory practice of denying African–American applicants an equal opportunity to view and rent apartments. The court denied the employer's motion to dismiss, holding that her allegations stated a claim under § 3617. *See also Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1305 (11th Cir.1998) (public official sued under § 3617, who fired employee for refusing to rent public housing in a discriminatory manner, is not entitled to qualified immunity); *Smith v. Stechel*, 510 F.2d 1162 (9th Cir.1975) (apartment managers fired for renting to African–Americans and Mexican–Americans have claim under § 3617); *Cass v. American Properties, Inc.*, 861 F.Supp. 55, 58 (N.D.Ill.1994) (§ 3617 was proper source of relief for employee who was fired for refusing to participate in discriminatory practices of landlord-employer); *Meadows v. Edgewood Management Corp.*, 432 F.Supp. 334, 335 (W.D.Va. 1977) ("section 3617 provides a remedy where a resident manager and maintenance technician are dismissed by their employers because of their aid or encouragement to tenants in asserting their right to fair housing").

It is apparent from the language of § 3617 and the HUD regulations that a plaintiff need only show (1) that she "aided or encouraged any other person in the exercise" of certain FHA rights and (2) that, "on account of" such, the defendant "interfered" with that effort or "retaliated" against the plaintiff. *See Baggett v. Baird*, 1997 WL 151544, *37 (N.D.Ga.); *United States v. Sea Winds of Marco, Inc.*, 893 F.Supp. 1051, 1055 (M.D.Fla.1995); *People Helpers, Inc. v. City of Richmond*, 789 F.Supp. 725, 732 (E.D.Va.1992); *cf. Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir.1991) (to prevail under § 3617, a plaintiff must establish that discriminatory intent "played some role" in the defendant's actions); "Casa Marie, Inc. v. Superior Court of Puerto Rico," 752 F.Supp. 1152, 1168 (D.Puerto Rico 1990) (in § 3617 case, "plaintiffs must demonstrate that their [membership in a protected group] formed some part of the basis for the defendants' actions even if it was not the sole motivating factor"). Hall contends that defendants "interfered" with her efforts to aid and encourage others in the vindication of their FHA rights and "retaliated" against her by misrepresenting her level of production to other agents, cutting off her telephone calls from customers for a month, and terminating her for protesting illegal conduct directed at her clients.

Hall has presented evidence that, upon learning that two African–Americans who had sought housing in a "white area" had been rebuffed—Gill–Smith complained to Hall that, without inquiring as to Gill–Smith's income, a Lowder New Homes agent told her that she could not afford a home, and Washington complained to Hall that an agent had told Washington that she would "destroy[ ] the integrity of the neighborhood" if she put vinyl flooring in-

stead of tile in her bathroom—Hall brought these complaints to the attention of several individuals associated with Lowder Realty and Lowder New Homes as possible violations of the FHA. The court believes this conduct by Hall was, at the least, protected by § 3617 from retaliatory actions by the defendants.

Hall must therefore show that defendants retaliated against her on account of her aid to customers in the exercise of their rights under the FHA. As stated, Hall contends that she was subjected to a number of adverse actions. First, she contends that, at the awards ceremony in February 1997, Dorough purposefully reported Hall's numbers incorrectly at $ 3.4 million rather than $ 4.1 million, after she had provided him with the correct amount. Hall argues that under-representing her level of production was harmful because her level of production determines whether other agents will come to her for help with difficult sales and make referrals to her.

The court does not believe that these actions alone would be sufficiently coercive or interfering to present a cognizable claim under § 3617, especially given that Dorough made these remarks in presenting Hall with an award for being a top agent. However, these slights were compounded by intentionally cutting off her communication with customers.

Hall has presented evidence that, after the awards ceremony and throughout the month of March, she stopped receiving phone calls at the office from customers. The only calls she received during that time were from her direct pager. She claims that this was especially harmful and unusual because March had historically been a high-sales month for her. When she complained about the lack of calls,

Stafford advised her to attend a sales meeting, and, after she attended, she immediately began receiving calls again.

This evidence supports a reasonable conclusion that someone at Lowder Realty kept Hall from receiving phone calls for the month of March. The court finds this conduct sufficiently harmful and threatening to constitute coercion and retaliation under § 3617. Likewise Hall's termination and the attending loss of privileges, clients, and business constitutes coercion and retaliation under § 3617.[83]

The court next must determine whether the retaliation Hall suffered was "on account of" her aid to her customers. In retaliation cases under Title VII and similar statutes, the Eleventh Circuit has interpreted "the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chem., Inc.*, 988 F.2d at 1571–72 (11th Cir.1993)). As FHA cases are, like Title–VII retaliation cases, subject to the *McDonnell Douglas* burden-shifting approach as, the court will apply the same analysis here.

Hall has made a prima-facie showing that she suffered retaliation on account of her efforts on behalf of Gill–Smith. The record reflects that Hall reported her concerns about Gill–Smith to Dorough, who reported her complaint to James Lowder, who in turn had her employment terminated. However, Hall reported Washington's complaint to Bonds, Wills, and Haviland, and there is no evidence that they were involved in any retaliation against Hall.

---

**83.** Defendants contend that Hall cannot make out a prima-facie case because she was not terminated. The court finds that there is a genuine issue of material fact as to whether

Hall was terminated. Hall testified that she was terminated in a meeting with Dorough, Sparkman, and Haviland on May 22, 1997.

1324

Therefore, she has established a prima-facie case only as to Gill–Smith.

"Once a prima facie case has been established, the defendant may come forward with legitimate reasons for the employment action to negate the inference of retaliation." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993). "If the defendant offers legitimate reasons for the employment action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reasons offered by the defendant are pretextual." *Id.*

▆▆ Defendants contend that Dorough's misrepresentations of Hall's production figures were honest mistakes. They also contend that because there is no evidence that defendants interfered with her sales calls, they cannot offer a reason to explain this allegation. The court disagrees. Hall has presented evidence that her sales calls dropped off precipitously after the awards ceremony and that they restarted as soon as, on Stafford's advice, she attended a sales meeting. As noted earlier, this evidence supports a reasonable conclusion that defendants interfered with Hall's customer calls. Therefore, defendants have failed to meet their burden of proffering a legitimate reason for the drop in sales calls.

Defendants contend that Hall was terminated because she "[w]ould not communicate with management and [was] disruptive in two different meetings." [84] Although the allegation that Hall would not communicate is unsupported, there is evidence that Hall was disruptive in two meetings. Defendants have produced a legitimate, nondiscriminatory reason for terminating Hall.

To survive summary judgment, Hall must produce facts sufficient to show that the proffered reason was a pretext for retaliation. The elimination of the prima-facie case and its "mandatory presumption" of discrimination "does 'not imply that the trier of fact no longer may consider evidence previously introduced to establish a prima facie case.'" *Combs*, 106 F.3d at 1528. Instead, that evidence survives, and may be sufficient to avoid summary judgment in favor of the defendant. *Combs*, 106 F.3d at 1530 ("In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case."). However, the evidence is subjected to a higher level of scrutiny than at the prima-facie stage: therefore, "to survive a motion for summary judgment ... [the plaintiff must] present[ ] evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, non[retaliatory] reasons." *Evans*, 131 F.3d at 964–965 (reversing a district court's grant of summary judgment); *Combs*, 106 F.3d at 1530–32; *B.P Oil Co.*, 32 F.3d at 527–28; *see also St. Mary's Honor Center*, 509 U.S. at 509–511, 113 S.Ct. at 2748–2749 (holding that, though rebuttal of defendant's proffered reasons does not compel judgment for the plaintiff, rebuttal does permit trier of ultimate fact to find in favor of the plaintiff). To put the matter slightly differently, "[t]he district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538.

**84.** Lowder defendants' evidentiary submission, exhibit D (deposition of John W. Dorough, Jr.), at 252.

Hall offers no evidence that she was not disruptive during two meetings. However, the record is rife with evidence that, contrary to what defendants claim, Hall actually did communicate with management. Indeed, she repeatedly complained to management about her lack of referrals outside of Area Five and the alleged maltreatment of her customers, and her lack of telephone calls in the spring of 1997. It may be Hall failed to communicate about a different issue. However, as defendants have not specified what that issue was, the court doubts the validity of that proffered reason.

Furthermore, Hall had complained repeatedly over the prior year of racially discriminatory treatment of her clients and herself. In late March 1997, the CAFHC filed a case against defendants charging violations of the FHA involving one of Hall's former clients. In mid-May, when defendants' investigation of the lawsuit was in full swing, Hall complained to Lowder and Dorough about discriminatory referral practices. At the time, she was Lowder Realty's number two producer. Given the amount of money she brought into the company, it is fair to expect that defendants would have counseled her at least once before terminating her. However, there is no evidence that they did so. In short, the court finds there is a genuine issue of material fact as to whether Hall's termination was motivated, at least in part, by retaliation for aiding others in the exercise of their rights under the FHA. Therefore, the court will deny summary judgment on Hall's claim under § 3617.

### 2. Sections 1981 and 3606

As noted earlier, § 3606 prohibits among, other things, denying access to or membership in or discriminating in the terms of participation in a real-estate sales organization on the basis of race. *See* 42 U.S.C.A. § 3606. Hall argues that defendants violated § 3606 by terminating her on account of her race.[85] She also argues that defendants violated § 3606 by threatening to terminate her real-estate license.

Hall cites *Favors v. MAQ Management Corp.*, 753 F.Supp. 941 (N.D.Ga.1990), in support of her argument. In that case, the plaintiff, an African–American applicant for a job with a real-estate management company, sought to apply § 3606 to her claim of discriminatory failure to hire. Defendants argued that the FHA is inapplicable to employment-discrimination claims. The court rejected defendants' argument, reasoning as follows: "Defendants' construction unduly narrows the facially broad language of the statute. To 'deny participation' in a 'facility relating to the business of renting dwellings' implies denying employment." *Id.* at 944. "There is no reason to assume that Congress did not intend to reach hiring in the housing sector. . . ." *Id.* Because the allegations indicated that by not hiring African–Americans, defendants were engaging in a "back door" scheme of housing discrimination, the court found the FHA applied.

The court finds the reasoning of *Favors* persuasive. Termination, like refusal to hire, denies continued participation in a real-estate-related business. Therefore, the court concludes that § 3606 may, in some circumstances, provide redress for termination that is racially motivated. Similarly, § 1981 prohibits racial discrimination in employment.

■ Hall has presented insufficient evidence to conclude that her termination was based on race. To prove a prima-facie case of discriminatory termination, Hall would have to show that she is a member of a protected class, she was qualified for

---

85. Hall also raises a retaliation claim under § 3606. As this claim appears to be the same as her retaliation claim under § 3617, the court declines to address it.

her job, she was terminated, and a similarly situated person not in her protected class was treated differently. *See, e.g., United States v. Crosby*, 59 F.3d 1133, 1135 (11th Cir.1995) (a prima-facie case of disparate treatment based on race, sex, or national origin is established when an employee shows that an employer treats some people less favorably than others because of their race, sex, or national origin).

■ Hall has not established that any similarly situated agents were treated differently. Hall points to two agents who were terminated for failing to meet performance standards. She notes that the agents were first counseled and trained in order to improve their performance and that she, in contrast, did not receive any progressive discipline before she was terminated.[86] However, these agents are not similarly situated because they were terminated for failure to meet performance standards regarding income,[87] whereas Hall was allegedly terminated for failure to communicate and disruptive behavior in meetings. The only other agent Hall points to who was terminated for anything other than underperformance was Jerri Baker. Baker was given the choice of resigning or being terminated because she caused "disruptiveness in the office." However, her disruptiveness in the office was not comparable to Hall's: Baker's presence was disruptive because she had an affair with Wills, who is married, and other agents accordingly refused to sit next to her, and because nude pictures of her at a Harley Davidson rally appeared in a national magazine.[88] In short, Baker is not a proper comparator because there is no evidence that she was insubordinate. Nor has Hall provided evidence that Lowder Realty has a progressive discipline

policy which was not followed in her case. Therefore, the court will grant summary judgment on Hall's discriminatory-termination claim under §§ 3606 and 1981.

■ Hall also claims that defendants violated § 3606 by threatening to terminate her real-estate license. She contends that terminating her license would have denied her participation in a real-estate organization. In response, defendants deny that Dorough threatened to terminate her license and argue that, because her license was not terminated, she suffered no injury.

Hall argues that the threat of a violation of the FHA is a sufficient foundation upon which to base a claim. In support of her argument, she cites the FHA's definition of an "aggrieved person," as "includ[ing] any person who ... believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C.A. § 3602(i). Hall cites no case law in support of her argument.

The court finds Hall's argument untenable. The aggrieved-person definition simply confers standing to those who fear imminent injury. Had Hall sued because she feared that defendants were about to cancel her real-estate license, she could have been an 'aggrieved person' under the quoted provision. However, the court sees no indication in the statute that Congress intended to make threats that are not carried through actionable. The court therefore will grant summary judgment on Hall's claim that defendants violated § 3606 by threatening to terminate her license.

---

86. *See* Dorough deposition at 217–18; Wills deposition at 217–19.

87. *See* Dorough deposition at 217–18.

88. Ex. 3, Lowder deposition at 618–20; Ex. 22.

## IV. CONCLUSION

Accordingly, it is ORDERED that the motion for summary judgment filed by defendants on November 30, 1998, is granted as to plaintiff's claims under 42 U.S.C.A. § 3604(a) and her job-and-license-termination claims under 42 U.S.C.A. §§ 1981 and 3606, and is denied in all other respects.