Nash J. COOLEY, Plaintiff,

v.

STERLING BANK, et al., Defendants.

No. CIV.A. 02–A–1069–N.

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 4, 2003.

Daniel A. Hannan, Mobile, Greg L. Davis, Montgomery, for Plaintiffs.

Dennis R. Bailey, R. Austin Huffaker, Montgomery, for Defendants.

### MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

## I. INTRODUCTION

This cause is before the court on a Motion for Summary Judgment (Doc. # 40) and a Motion to Strike (Doc. # 69) filed by Defendants Sterling Bank and Synovus Financial Corporation of Alabama, and two Motions to Strike (Docs. # 59 & 71) filed by Plaintiff Nash Cooley.

The Plaintiff filed his original Complaint (Doc. # 1) in this case against Sterling Bank on September 17, 2002. The Plaintiff filed an Amended Complaint (Doc. # 15) on January 31, 2003, in which the Plaintiff added Synovus Financial Corporation of Alabama and the Federal Deposit Insurance Corporation ("FDIC") as Defendants. On March 10, 2003, the FDIC filed a Motion to Dismiss (Doc. # 20). On April 4, 2003, the Plaintiff filed a motion asking the court for leave to file a Second Amended Complaint excluding the FDIC as a Defendant (Doc. # 23). The court granted the Plaintiff's motion to amend (Doc. # 26) and the FDIC's Motion to Dismiss (Doc. # 25) on April 8, 2003. Thereafter, the Plaintiff filed his Second Amended Complaint (Doc. # 27). In the Complaint, the

Plaintiff brings claims under 42 U.S.C. § 1981, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, alleging that the Defendants denied his application for a $100,000 unsecured line of credit because of his race. The Defendants responded by filing a motion for Motion for Summary Judgment on June 9, 2003.

For the reasons to be discussed, the Defendants' Motion for Summary Judgment is due to be GRANTED, the Defendants' Motion to Strike is due to be GRANTED in part, and the Plaintiff's Motions to Strike are DENIED.

## II. *SUMMARY JUDGMENT STANDARD*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing. there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. *FACTS*

The submissions of the parties establish the following facts, construed in a light most favorable to the nonmovant:

The Plaintiff is a sixty-six year old African–American male who lives in Montgomery, Alabama. *See* Cooley Depo., p. 8. Since the mid–1980s, the Plaintiff's primary source of income has come from his ownership of residential rental properties in the Montgomery area. *Id.* at p. 33. The Plaintiff currently owns approximately fifteen apartment units and twenty-four houses. *Id.* at p. 34.

In order to have the financial flexibility to invest in new real estate ventures, the Plaintiff has maintained active lines of credit with various financial institutions.

The Plaintiff began his first line of credit with South Trust Bank in Montgomery during the late–1980s. *Id.* at pp. 59–60. The Plaintiff initially started with an unsecured line for $75,000, but increased the amount to $100,000 within several years. *Id.* at p. 60. The Plaintiff has consistently renewed this line of credit and maintains it today. *Id.* at p. 59.

In 1995, the Plaintiff applied for a second line of credit at Colonial Bank in Montgomery. *Id.* at pp. 62–63. The Plaintiff received a one-year renewable unsecured line of credit for $100,000. *Id.* at p. 65. The Plaintiff renewed this line of credit annually through 2001, at which time he terminated it voluntarily. *Id.* at p. 70.

By the summer of 2000, the Plaintiff had $100,000 unsecured lines of credit at two separate banks.[1] *Id.* at p. 73. The Plaintiff ultimately hoped to establish five $100,000 lines of credit in order to complete a real estate project that he began in 1992. *See id.* at pp. 77–78. To meet his financial goals, the Plaintiff approached Sterling Bank ("Sterling") in September 2000 about another $100,000 unsecured line of credit. *Id.* at pp. 83–84. The Plaintiff chose Sterling because he had a prior business relationship with Kenny Hill, the Branch Manager of Sterling's Taylor Road Branch, when Hill worked at Colonial Bank. *Id.* In early 2000, Hill spoke with the Plaintiff about bringing some of his business to Sterling. *Id.* at p. 84. The Plaintiff agreed to this request and opened a checking account with Sterling. *Id.* at pp. 84–85. The Plaintiff maintained a balance of approximately $15,000 in the account, and deposited a $100,000 insurance settlement several months before applying for his credit line. *Id.* at p. 85.

In September 2000, the Plaintiff met with Hill to apply for a $100,000 unsecured line of credit with Sterling. The Plaintiff submitted a credit application and provided Hill with all of his relevant financial information, including tax returns and a personal financial statement. *See* Hill Depo., at p. 36. On September 15, 2000, Hill conducted a credit check on the Plaintiff that revealed a "Beacon Score" of 749.[2] *See id.* at p. 97; Plaintiff's Response, Exhibit 11 (Plaintiff's credit report). Although this score was commensurate with an "excellent credit rating," *see* Hill Depo., at p. 97, Hill became concerned about the Plaintiff's income level after reviewing the remainder of the Plaintiff's financial information. *Id.* at p. 43. Specifically, the Plaintiff's most recent tax return indicated that the Plaintiff and his wife had a joint pre-tax income of $106,214. *See* Plaintiff's Response, Exhibit 8. Of this amount, Hill calculated that the income attributable to the Plaintiff was $51,483.[3] *Id.* Because the

---

1. The evidence submitted also reflects the fact that the Plaintiff established a third line of credit with South Trust Bank in Atlanta, Georgia in 1998. *See* Jackson Depo., pp. 16–18. Like his other lines, the Plaintiff received a renewable $100,000 unsecured line for credit in his name only. *Id.* at p. 17. Although the evidence is unclear on this point, this line had apparently lapsed or was up for renewal during the summer of 2000. The Plaintiff stated in his deposition that he had this line of credit, however, "he hadn't signed the papers yet." *See* Cooley Depo., at p. 74.

2. According to Sterling's Loan Policy:

A Beacon Score identifies the risk of delinquency within 24 months and is calculated by the Credit Bureau. This score does not take into account capacity to repay, value of collateral, etc. and therefore should not be used as the sole basis for extending or denying credit.

*See* Plaintiff's Response, Exhibit 9, p. SB 106.

3. The Plaintiff does not dispute this calculation and even admits that his personal income was "approximately forty-something to fifty-something that year." *See* Cooley Depo., at p. 93.

Plaintiff was applying for an unsecured line of credit in his name only, Hill was worried that the Plaintiff's income level was insufficient for him to obtain a $100,000 line of credit. *See* Hill Depo., at p. 44. Additionally, Hill was apprehensive about approving the Plaintiff's request with knowledge that the Plaintiff had two existing $100,000 lines of credit. *Id.* at p. 45.

After Hill compiled the Plaintiff's loan materials, he presented them to Bob Ramsey, Sterling's Executive Vice President in charge of lending. *Id.* at p. 49. Because Hill did not have the authority to approve a loan in excess of $50,000, he met with Ramsey to discuss the Plaintiff's loan application. *Id.* at pp. 57–59. During this meeting Ramsey reviewed the Plaintiff's financial statement and tax return. *See* Ramsey Aff., pp. 1–2. Hill expressed his concerns about the Plaintiff's financial situation and Ramsey concurred. *See* Hill Depo., p. 52. In short, Ramsey concluded that the Plaintiff's "individual income of $51,464 simply did not justify adding another $100,000 unsecured debt on top of the two existing lines of credit at other banks totaling $200,000." *See* Ramsey Aff., p. 2. Instead of denying the Plaintiff's request outright, Ramsey suggested making either a secured loan in the same amount or an unsecured loan for $25,000. *Id.* After Ramsey and Hill agreed that a counteroffer was the best solution, Hill informed Ramsey that the Plaintiff was "African American and might claim racism." *Id.* at p. 3. In response, Ramsey suggested discussing the matter with Alan Worrell, Sterling's Chief Executive Officer. *Id.* Worrell agreed with Hill and Ramsey's assessment of the Plaintiff's financial situation and indicated his preference to find an alternative way to establish a credit relationship with the Plaintiff. *Id.*

On September 18, 2000, Hill informed the Plaintiff of Sterling's decision and gave him a a document entitled "Notice of Action Taken." The document explained that Sterling could not provide the Plaintiff with a $100,000 unsecured line of credit, but was willing to offer "a $25,000 unsecured line of credit or a larger secured line." *See* Plaintiff's Response, Exhibit 6. In response, the Plaintiff immediately requested a list of the individuals on Sterling's Board of Directors so he could contact them about his loan denial. *See id.* at Exhibit 8. The Plaintiff also expressed his belief that Sterling was discriminating against him on the basis of race. *Id.*

After learning of the Plaintiff's reaction, Worrell requested that Hill arrange a meeting between the Plaintiff and Worrell. *See* Worrell Depo., at p. 78. During their meeting, the Plaintiff explained to Worrell that he wanted a line of credit from Sterling in order to "purchase a home and do bigger projects." *See* Cooley Depo., at p. 97. Knowing of the Plaintiff's two existing lines, Worrell asked the Plaintiff why he needed a third line. *Id.* The Plaintiff found this question "really insulting" because no banker had ever insinuated to him that he had enough money to accomplish his projects. *Id.* at pp. 97–99. Worrell informed the Plaintiff that he had "good credit," but expressed concerns about the Plaintiff's financial ability, given his income level and existing lines of credit, to "service that much debt if those loans were drawn upon." *See* Worrell Depo., at p. 80. At the conclusion of the meeting, Worrell emphasized that he wanted to do business with the Plaintiff and hoped the Plaintiff would consider Sterling's counteroffer. *Id.* at pp. 80–81.

During Sterling's Board of Directors meeting on September 20, 2000, Worrell informed the Board of the Plaintiff's stated intent to contact individual Board members about his loan application. *Id.* at p. 383. Worrell explained to the Board that

the Plaintiff was accusing Sterling of discrimination because Sterling proposed a counteroffer rather than approve the Plaintiff's loan application on his terms. *Id.* at p. 384. Additionally, Worrell provided each Board member with a memorandum prepared by Hill that explained the reasons behind Sterling's decision. *Id.* The memorandum states that based on the Plaintiff's "income level, amount of outstanding debt, and open lines of credit," Hill, Worrell and Ramsey made a "group decision" to offer the Plaintiff "a $25,000 unsecured line of credit or the option to discuss a larger line on a secured basis." *See* Plaintiff's Response, Exhibit 8.

According to Greg Calhoun, an African–American member of Sterling's Board of Directors, individual Board members began discussing the Plaintiff's application during the meeting. Calhoun stated in his deposition that the Board "didn't think [the Plaintiff] could qualify for a hundred thousand dollar line of credit being … that he was a retired school teacher." *See* Calhoun Depo., p. 22. Moreover, Board members "jok[ed] about [the Plaintiff's application]" and "laughed about the Plaintiff." *Id.* In response, Calhoun told the other Board members that he believed they were putting the Plaintiff down. *Id.* at p. 23. Calhoun then "told them they was [sic] all Republicans, and they're all members of the Montgomery Country Club. And there's no way that a black man can come in here and get money from the bank." *Id.* Following this statement, Calhoun informed the Board that he was resigning. *Id.* In Calhoun's opinion, Sterling denied the Plaintiff's loan application "because of [the Plaintiff's] skin color." *Id.* at p. 87.

On October 11, 2000, the Plaintiff sent Hill a handwritten letter requesting more information about why Sterling denied his loan application. *See* Plaintiff's Response, Exhibit 7. On October 27, 2000, Hill drafted a response letter explaining how Sterling reached its decision:

In the Financial Package you provided to me, you included a 1999 tax return showing a joint adjusted gross income of $106,214. Since your loan request was from you alone, I backed out your wife's salary of $54,730, leaving an income attributable to you of $51,484. On your financial statement you show a debt of $265,000 and unsecured lines totaling an additional $200,000. Bottom line, with a potential debt load of $465,000 on income of $51,484, I was prepared to offer a $25,000 unsecured line or a larger line on a secured basis.

*Id.* at Exhibit 9. Additionally, Hill stated that "this credit decision was a bank decision (in which I was involved) and did not involve the Board." *Id.*

## IV. *DISCUSSION*

In his Second Amended Complaint, the Plaintiff contends that the Defendants, Sterling Bank and Synovus Financial Corporation of Alabama ("Synovus"), violated 42 U.S.C. § 1981, the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, and the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, by denying his application for a $100,000 unsecured line of credit because of his race. Section 1981 provides that "[a]ll persons … shall have the same right in every State and Territory to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. § 1981. Section 1981 applies to this case because the Plaintiff contends that Sterling prevented him from signing a loan contract because of his race. *See* Worrell Depo., p. 293 (stating that a contract would have governed the credit relationship between Sterling and the Plaintiff). Moreover, the ECOA states that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction … on the

basis of race." 15 U.S.C. § 1691(a)(1). Finally, the FHA makes it unlawful for "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race." 42 U.S.C. § 3605(a). Under the FHA, a "residential real estate-related transaction" is defined to include "the making or purchasing of loans or providing other financial assistance ... for purchasing, constructing, improving, repairing, or maintaining a dwelling." 42 U.S.C. § 3605(b). The Plaintiff's FHA rights are implicated in this case because his evidence, when viewed in a light most favorable to him, establishes that he sought a loan from Sterling in order to complete his residential real estate projects. *See* Cooley Depo., p. 97 (stating that the Plaintiff wanted a line of credit in order to "purchase a home and do bigger projects").[4]

■ Before delving into the factual merits of these claims, the court must first address a legal dispute between the parties regarding the Plaintiff's burden of proof. Because section 1981, the ECOA and the FHA are anti-discrimination statutes, the Defendants contend that the court's analysis should be governed by the methods of analysis developed for use in cases under Title VII of the Civil Rights Act of 1964. According to this approach, the Plaintiff must present either direct evidence of discriminatory intent, or use the factors set forth in burden-shifting analysis developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to raise, by indirect or circumstan-

tial evidence, an inference of discrimination. *See Hall v. Lowder Realty Co., Inc.*, 160 F.Supp.2d 1299, 1313 (M.D.Ala.2001). In contrast, the Plaintiff relies exclusively on a decision from the United States Court of Appeals for the Seventh Circuit in which that court rejected the *McDonnell Douglas* burden-shifting model for credit discrimination claims brought under the ECOA and FHA. *See Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 715 (7th Cir.1998) (holding that "neither *McDonnell Douglas* nor the kind of *McDonnell Douglas* knock off which we have just sketched ... is available here"). Instead of relying on *McDonnell Douglas*, the Seventh Circuit explained that a plaintiff in a credit discrimination case can defeat summary judgment by "show[ing] in a conventional way, without relying on any special doctrines of burdens shifting, that there is enough evidence, direct or circumstantial, of discrimination to create a triable issue." *Id.*

Although the Seventh Circuit's approach to credit discrimination claims is interesting, this court is bound to follow the precedent set forth by the Eleventh Circuit. With respect to claims brought under section 1981 and the FHA, the Eleventh Circuit has expressly held that Title VII's method of analysis governs. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1298 n. 12 (11th Cir.1999) (stating that "[c]laims under 1981 are analyzed in the same manner as claims under Title VII"); *Secretary, United States Dep't of Hous. and Urban Dev. v. Blackwell*, 908 F.2d 864, 870 (11th Cir.1990) (holding that the "the legal framework developed by the federal courts in discrimination cases brought under ... Title VII of the Civil Rights Act" applies in

---

4. Although the Plaintiff raises claims under both the ECOA and FHA, the court notes that the Plaintiff would only be entitled to recovery under one statute. *See* 15 U.S.C. § 1691e(i) ("No person aggrieved by a viola-

tion of [15 U.S.C. § 1691] and by a violation of section 3605 of Title 42 shall recover under [15 U.S.C. § 1691] and section 3612 of Title 42, if such violation is based on the same transaction.").

FHA cases). As for the Eleventh Circuit's stance on ECOA claims, the court notes that it has been unable to locate a case in which the Eleventh Circuit applied Title VII's framework to a claim brought pursuant to 15 U.S.C. § 1691(a). Nevertheless, this court concludes that Title VII's analytical approach applies to ECOA discrimination claims. The court rejects the approach take by the Seventh Circuit for two reasons. First, all circuits that have addressed the issue, other than the Seventh, have applied Title VII's framework to ECOA claims. *See Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1246 (10th Cir.1999) (affirming the district court's decision to analyze the plaintiff's ECOA "claim in the same manner as discrimination claims brought under Title VII"); *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir.1998) (applying Title VII's framework to ECOA claim); *Moore v. United States Dep't of Agric.*, 55 F.3d 991, 995 (5th Cir.1995) (stating that because the plaintiff produced direct evidence of discrimination in ECOA claim, the plaintiff could "bypass the *McDonnell Douglas* burden-shifting framework commonly applied in discrimination cases"); *Crestar Bank v. Driggs*, No. Civ. A. 99–2031–GTV, 1993 WL 198187, at *1 (4th Cir. June 11, 1993) (applying Title VII's framework to ECOA claim); *Mercado–Garcia v. Ponce Fed. Bank*, 979 F.2d 890, 893 (1st Cir.1992) (same); *Gross v. United States Small Bus. Admin.*, 669 F.Supp. 50, 52–53 (N.D.N.Y.1987), *aff'd* 867 F.2d 1423 (2d Cir.1988) (same); *see also Sallion v. SunTrust Bank, Atlanta*, 87 F.Supp.2d 1323, 1327 (N.D.Ga.2000) (same); *Massey v. First Greensboro Home Equity, Inc.*, No. 97–1292–CIV–T–17, 1998 WL 231141, *9 (M.D.Fla. April 27, 1998) ("In analyzing the ECOA statute, courts have frequently imported from the employment discrimination arena (i.e., Title VII) the tests for establishing a cause of action."). Second, the Eleventh Circuit has unflinchingly applied Title VII's analytical framework to a host of anti-discrimination statutes, thus this court does not find any reason to suspect that the Eleventh Circuit would take a different approach to the ECOA. *See Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir.2000) (applying Title VII's analysis to Americans with Disabilities Act); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir.2000) (applying Title VII's analysis to Age Discrimination in Employment Act); *Wright*, 187 F.3d at 1298 (applying Title VII's analysis to section 1981); *Blackwell*, 908 F.2d at 870 (applying Title VII's analysis to FHA); *see also Carter v. Lurleen B. Wallace Junior College*, 173 F.Supp.2d 1204, 1209 (M.D.Ala.2001) (applying Title VII's analysis to Rehabilitation Act).

Having concluded that Title VII's analytical framework will govern the Plaintiff's section 1981, FHA and ECOA claims, the court will now address the merits of these claims. As discussed above, Title VII's framework permits a plaintiff in a discrimination case to proceed by one of two means: 1) circumstantial evidence under *McDonnell Douglas* burden shifting, or 2) direct evidence. *See Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1359 (11th Cir.1999). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. Therefore, remarks by nondecisionmakers or remarks unrelated to the decision making process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (citations omitted). As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the protected classification are direct evidence of discrimination." *Id.* (internal quotations omitted); *see Gullatte v. Westpoint Stevens, Inc.*, 100

F.Supp.2d 1315, 1318 (M.D.Ala.2000) (explaining that "the paradigm example of direct evidence would be a statement such as 'Fire Earley—he is too old'.") (quoting *Merritt v. Dillard Paper Company*, 120 F.3d 1181, 1190 (11th Cir.1997)). In this case, none of the statements regarding the Plaintiff's race outlined above meet the standards of direct evidence of race discrimination, thus the court's analysis will be guided by the three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the *McDonnell Douglas* analysis, the plaintiff must first establish a prima facie case of race discrimination. *Id.* at 802, 93 S.Ct. 1817. At the second stage, the burden of production is placed upon the defendant to articulate a legitimate non-discriminatory reason for its adverse action. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the defendant satisfies its burden of production, the plaintiff then has the burden of persuading the court that the proffered reason for the defendant's action is a pretext for discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. The plaintiff may satisfy this burden either directly, by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of belief. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997). A plaintiff's prima facie case, combined with sufficient evidence to find that the defendant's as-serted justification is false, may permit the trier of fact to conclude that the defendant unlawfully discriminated against the plaintiff.[5] *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Although *McDonnell Douglas* originally articulated the elements required for a prima facie case of discrimination in the employment setting, the Eleventh Circuit has recognized that the "elements of a prima facie case are flexible and should be tailored, on a case-by-case basis, to differing factual circumstances." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1123 (11th Cir.1993) (internal quotations omitted); *see Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (stating that the *McDonnell Douglas* analysis "was never intended to be rigid, mechanized, or ritualistic" and is "merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination"). In the credit discrimination context, a plaintiff can establish a prima facie case of discrimination by offering evidence showing: 1) that the plaintiff is a member of a protected class; 2) that the plaintiff applied for and was qualified for a loan from the defendant; 3) that the loan was rejected despite the plaintiff's qualifications; and 4) that the defendant continued to approve loans for applicants outside of the plaintiff's protected class with similar qualifications. *See, e.g., Rowe v. Union Planters Bank*, 289 F.3d 533, 535 (8th Cir.2002) (listing prima facie elements for credit discrimination claim brought under

---

5. "Although the defendant is entitled to summary judgment in its favor if the plaintiff does not proffer sufficient evidence of pretext, the converse is not necessarily true. If the plaintiff does proffer sufficient evidence that the defendant's stated reasons are pretextual, the plaintiff still may not be entitled to take his case to a jury." *Chapman v. AI Transport*, 229 F.3d 1012, 1025 n. 11 (11th Cir.2000) (en banc). Indeed, there may "be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.*

the FHA and ECOA); *Sallion*, 87 F.Supp.2d at 1329 (listing prima facie elements for credit discrimination claim brought under section 1981 and ECOA).[6]

In this case, the parties do not dispute the existence of the first and third elements, as the Plaintiff is an African–American who applied for a line of credit and Sterling rejected his application despite his qualifications. Therefore, the only contested aspects of the Plaintiff's prima facie case are whether the Plaintiff was "qualified" for a $100,000 unsecured line of credit, and whether Sterling continued to approve loans for white applicants with "similar qualifications." Even assuming the Plaintiff could establish that he was qualified for the line of credit he requested, the court concludes that the Plaintiff has not presented sufficient evidence to establish that Sterling approved loans for white applicants with similar qualifications.

■ In the employment discrimination context, the Eleventh Circuit has explained that in order to meet the comparability requirement of a prima facie case, "a plaintiff is required to show that he is similarly situated in all relevant aspects to the non-minority employee." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir.2001). "[T]he 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result." *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989). For example, when an employee asserts a discrimination claim based on an adverse discipline decision, the most important factors to consider when comparing the plaintiff against another employee "are the nature of the offenses committed and the nature of the punishments imposed." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999) (citing *Dart-*

*mouth Review*, 889 F.2d at 19). Applying this standard to the credit discrimination context, the Plaintiff must present evidence that he was "similarly situated in all relevant aspects" to the non-minority applicants who received loans from Sterling. In other words, a comparator's credit qualifications and loan details must be "nearly identical" to the Plaintiff's in order to prevent this court from second guessing the bank's business decision "and confusing apples with oranges." *Id.; see Sallion*, 87 F.Supp.2d at 1331 ("[A plaintiff] does not have to find an exact match between her application and applicants outside the protected classes who received loans, but comparator loan files must be significantly parallel in every material respect.").

■ In support of his position that Sterling approved loans for non-minority applicants with similar qualifications, the Plaintiff has introduced into evidence credit files of twenty Caucasian credit applicants who sought unsecured loans of $100,000 or more between January 2000 and April 2002. *See* Worrell Depo., Exhibits 16–35. Additionally, the Plaintiff has submitted an affidavit from Charles L. "Rusty" Williams, an expert in banking and loan decision making, that analyzes this data. *See* Plaintiff's Response, Exhibit 1. Although Williams concedes that "not all of the files produced are comparator loan files," he has highlighted three specific files that he believes "significantly parallel" the Plaintiff's loan file. *Id.* at p. 5. Williams directs the court's attention to the loan files identified by the parties as numbers 17, 19, and 29. *See* Worrell Depo., Exhibits 17, 19, 29; Plaintiff's Response, Exhibits 17, 19, 29.

After considering the factual specifics of these files against the Plaintiff's file, the

---

**6.** The court notes that neither party disputes the elements required to establish a prima facie case of credit discrimination. *See* Plain-

tiff's Response, p. 25 (listing prima facie elements of a credit discrimination claim); *See* Defendants' Brief, p. 11 (same).

court concludes that they are neither "nearly identical" nor "similarly situated in all relevant aspects." This conclusion is warranted for several reasons. First, unlike the three comparators, the Plaintiff was the only person who had active unsecured lines of credit at other financial institutions at the time he applied for his loan. Second, the undisputed evidence establishes that the Plaintiff's annual income was approximately $51,000.[7] *See* supra note 3. By comparison, "loan 17" earned $145,000, "loan 19" earned $300,000, and "loan 29" earned $148,000. *See* Plaintiff's Response, Exhibits 1(A)-(C). Stated differently, the closest comparator to the Plaintiff earned approximately three times as much money as he did. Third, the Plaintiff was applying for his first line of credit with Sterling, thus he did not have an established credit relationship. In contrast, "loan 17" had been renewed 3 times, "loan 19" had been renewed twice, and "loan 29" had been renewed 5 times. *See* Worrell Depo., Exhibit 17, p. 35; Exhibit 19, p. 63; Exhibit 29, p. 349. Taken together, the Plaintiff has not directed the court to any evidence to suggest that an applicant similarly situated to the Plaintiff in terms of a prior credit relationship, existing lines of credit, and annual income received a loan from Sterling. Each of these factors is a "relevant aspect" of a bank's decision to extend or deny credit, thus the court concludes that the Plaintiff has not established the requisite degree of similarity to meet his burden at the prima facie stage.

Although the Plaintiff has directed the court to areas of his credit history which are similar to the three comparator loans—for example, total assets and Bea-con Score—the areas discussed above are sufficiently dissimilar to destroy any presumption of discrimination that could arise from a comparison of the loan files. As stated by the Eleventh Circuit, a "valid prima facie case creates a presumption that discrimination has occurred." *Walker v. Mortham*, 158 F.3d 1177, 1183 (11th Cir.1998). The "similarly situated" prong of the prima facie test is important because no presumption of discrimination arises the fact that a defendant treated dissimilar persons differently. The present case illustrates this principle, as the Plaintiff has failed to show that Sterling approved a loan for a non-minority applicant "similarly situated" to the Plaintiff "in all relevant aspects." Because the Plaintiff has failed to establish a prima facie case of discrimination, summary judgment is due to be granted in favor of the Defendants.

■ Even assuming, however, that the Plaintiff could establish a prima facie case, the court concludes that the Plaintiff's claims would fail at the pretext stage of the *McDonnell Douglas* analysis. With respect to Sterling's legitimate, non-discriminatory reason for its decision, Sterling denied the Plaintiff's loan request due to the Plaintiff's "heavy debt to income ratio." *See* Defendants' Brief, p. 14. Specifically, the Plaintiff had an individual income of $51,484 and his financial statement showed a debt of $265,000 and unsecured lines of credit totaling an additional $200,000. *See* Plaintiff's Brief, Exhibit 7. As Hill stated in his October 27, 2000 letter to the Plaintiff: "Bottom line, with a potential debt load of $465,000 on income of $51,484," Sterling was not prepared to

7. Although the Plaintiff's expert repeatedly states that the Plaintiff's income was $104,400, this figure ignores the fact that the Plaintiff filed a joint tax return with his wife. Had the Plaintiff applied for a joint line of credit with his wife, joint income would be appropriate for the income analysis. However, by opting for a line of credit in his name only, the Plaintiff's individual income is the only relevant figure for present purposes.

offer a $100,000 unsecured line of credit. *Id.*

Because Sterling articulated a non-discriminatory reason for its decision, the burden shifts back to the Plaintiff to offer sufficient evidence for a reasonable factfinder to conclude that Sterling's proffered reason was not the true reasons for its decision to deny the Plaintiff's credit application, but a pretext for discrimination. *See Walker*, 286 F.3d at 1277 ("Our pretext analysis focuses on a narrow question: Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?"). The Plaintiff can accomplish this task "(1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons." *See Standard*, 161 F.3d at 1332. The Plaintiff's evidence of pretext comes in three forms. First, Plaintiff points to Greg Calhoun's testimony as evidence of Sterling's racial discrimination. Second, the Plaintiff argues that Sterling's reasons are unworthy of belief because his application should have been accepted due to his superior credit rating and substantial net worth. Third, the Plaintiff contends that Sterling's failure to follow its own lending policies is evidence of pretext.

When viewed in a light most favorable to the Plaintiff, Greg Calhoun's testimony establishes that members of Sterling's Board of Directors laughed and joked after Worrell informed the Board that the Plaintiff may be contacting them about the decision to deny his loan.[8] According to

the Eleventh Circuit, however, "comments by non-decisionmakers do not raise an inference of discrimination, especially if those comments are ambiguous." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355 (11th Cir.1999). In the present case, the undisputed evidence establishes that Hill, Ramsey, and Worrell made a "group decision" to deny the Plaintiff's loan request prior to the September Board meeting, thus the Board was not a decisionmaker in this process. Only Ramsey, Worrell, or Sterling's loan committee had the requisite authority to approve a loan request. *See* Hill Depo., p. 50–51 (stating that before a loan can be presented to the committee, it must be approved by the president of the bank or a senior officer); Ramsey Aff., p. 1 ("Normal procedure at Sterling Bank is for loan officers to prepare a loan ticket to present to either loan committee, to Alan Worrell, to me, or any combination of the three for approval."). Furthermore, the laughter that Calhoun says he heard most certainly qualifies as an ambiguous statement that does not necessarily reflect discriminatory intent. *See Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir.1987) (holding that statement by non-decisionmaker that "[t]he Hardy Corporation was going to weed out the old ones" did not raise a genuine issue of material fact regarding discriminatory intent). There is no evidence to suggest that the Board made any racially derogatory jokes or comments. *Compare Busby v. City of Orlando*, 931 F.2d 764, 781–82 (11th Cir.1991) (concluding that racially derogatory jokes are evidence of discriminatory intent). Consequently, the Plaintiff cannot rely on Calhoun's deposition testimony as evidence of pretext.

---

8. The court agrees with the Defendants that Calhoun's testimony regarding why Sterling denied the Plaintiff's loan is due to be stricken. Calhoun was not involved in the decision-making process and admits that he never saw the Plaintiff's financial statement or income tax returns. *See* Calhoun Depo., p. 34. Consequently, Calhoun had no personal knowledge upon which to base his conclusion that Sterling denied the Plaintiff's loan application because of his race.

■ The Plaintiff also contends that he has undermined the truthfulness of Sterling's reasons by producing evidence of his excellent credit credentials. For example, the Plaintiff states that he "was worth $2.6 million when he applied for the loan, he had an unblemished financial history, his beacon score was very high, he had over half a million dollars in liquid assets, he had over $100,000.00 in Sterling Bank and he was close friends with [Kenny Hill,] the Vice President of Sterling Bank." *See* Plaintiff's Brief, p. 31. The central problem with this line of argument is that it fails to recognize that proving pretext requires more than showing that a bank was wrong in its assessment of the underlying facts or was otherwise lacking in wisdom in its decision not to extend credit. Federal courts do not sit as a court of appeals that reexamines a bank's business decisions. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991). Instead, the court's inquiry at the pretext stage is limited to whether the bank "gave an honest explanation of its behavior." *Id.* Therefore, to establish pretext, the Plaintiff must meet the bank's non-discriminatory "reason head on and rebut it," rather than simply present evidence of his positive credentials and ask the court to substitute its business judgment for that of the bank. *See Chapman*, 229 F.3d at 1030.

The Plaintiff relies heavily on the expert analysis of Charles "Rusty" Williams to establish pretext,[9] however, Williams's affidavit merely provides a thorough recitation of the Plaintiff's positive credentials and does not cast doubt on Sterling's assertion that the Plaintiff's individual annual income was insufficient relative to his current debt level to support another $100,000 unsecured line of credit. Although Williams states that the "assertion that [the Plaintiff's] income was not sufficient to support $300,000 of unsecured loans is unfounded[,]" Williams's only supporting evidence is the Plaintiff's "large number of liquid assets" and positive credit report. *See* Plaintiff's Response, Exhibit 1, p. 21. This evidence is insufficient to establish pretext because Williams completely ignores the fact that Sterling did not deny the Plaintiff's loan application because of insufficient liquid assets or a poor credit rating. Sterling rejected the Plaintiff's loan request because his annual income could not shoulder an additional $100,000 worth of debt. Rather than undermine Sterling's non-discriminatory reason "head on," Williams has "side-stepped" the issue by pointing to evidence of the Plaintiff's positive credentials, which, as the court previously explained, cannot establish pretext.[10]

---

**9.** Although Williams repeatedly states that Sterling's reasons for denying the Plaintiff's loan are "merely pretextual," these statements are legal conclusions that are due to be stricken. *See Strickland v. Royal Lubricant Co., Inc.*, 911 F.Supp. 1460, 1469 (M.D.Ala. 1995) ("[A]n expert may not give an opinion that amounts to a blanket assertion of how a case should be decided. Particularly on a motion for summary judgment, the admission of such an opinion would be contrary to the plaintiff's burden, which is to present a genuine issue of material fact. Hence, the court will disregard any attempt by Purswell to instruct the court on the requisite legal

conclusion in regard to the defendant's motion for summary judgment.").

**10.** Williams's failure to calculate the Plaintiff's "income-to-debt" ratio is telling. According to the court's calculations, the Plaintiff's ratio is .11 ($51,484/$465,000). Using the figures provided by the Plaintiff, the court reached this figure by dividing the Plaintiff's individual income by the sum of his total liabilities and existing lines of credit. In contrast, all three of the closest comparators had stronger ratios: "Loan 29" = .14 ($148,000/ $1,030,000); "Loan 19" = .21 ($300,000/ $1,443,000); "Loan 17" = .21 ($145,000/ $696,208). *See* Plaintiff's Response, Exhibit

■ Finally, the Plaintiff attempts to establish pretext by arguing that Sterling has failed to follow it own banking policies. *See* Plaintiff's Response, pp. 9, 31. According to Williams, Sterling did not adhere to its loan policies "when granting loans to various Caucasian individuals." *Id.*, Exhibit 1, p. 22. Nevertheless, Williams fails to direct the court to any specific loan policy provisions that Sterling violated. In his brief, the Plaintiff contends that Sterling "failed to calculate debt service coverage ratios on all but one of the twenty loan files." *Id.*, p. 9. Even assuming that this fact is true, it is not enough to establish pretext. Although "[d]epartures from normal procedures may be suggestive of discrimination," *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985), "the mere fact that [a bank] failed to follow its own internal procedures does not necessarily suggest that [the bank] was motivated by illegal discriminatory intent." *See Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir.1995). Here, the court concludes that Sterling's failure to calculate debt service coverage ratios in some of its loan files neither undermines its non-discriminatory reasons for denying the Plaintiff's loan nor provides a basis from which a reasonable jury could conclude that Sterling was more likely motivated by a discriminatory reason.[11] *See Standard*, 161 F.3d at 1332.

### V. *CONCLUSION AND ORDER*

For the reasons stated above, the court concludes that the Plaintiff has not proven a prima facie case of credit discrimination due to the absence of sufficient evidence to establish that Sterling approved loans for applicants outside of the plaintiff's protected class with similar loan qualifications. Even if the Plaintiff could prove his prima facie case, however, the court finds that the evidence submitted is insufficient to establish that Sterling's non-discriminatory reasons for its loan decision are pretextual. Accordingly, Sterling's Motion for Summary Judgment is due to be GRANTED, and it is hereby ORDERED as follows:

1) Plaintiff's Motions to Strike (Docs. # 59 & 71) are DENIED as moot.

2) Defendants' Motion to Strike (Doc. # 69) is GRANTED with respect to the statements made by Gregory Calhoun that are not based on his personal knowledge, and the statements made by Charles L. "Rusty" Williams that amount to conclusions of law. In all other respects, the Motion is DENIED as moot.

3) Defendants' Motion for Summary Judgment (Doc. # 40) is GRANTED as to all of the Plaintiff's claims.

4) Final Judgment will be entered in favor of the Defendants.

5) A separate judgement will be entered in accordance with this Memorandum Opinion and Order.

### *FINAL JUDGMENT*

In accordance with the Memorandum Opinion and Order entered on this day granting the Defendants' Motion for Summary Judgment,

Judgment is hereby entered in favor of Defendants Sterling Bank and Synovus Fi-

---

1(A)-(C). As these figures detail, the Plaintiff cannot establish that Sterling approved a loan for an individual with a ratio less than .14. Therefore, even a comparison of the income-to-debt ratios does not provide any evidence of pretext.

11. The Plaintiff has moved to strike those portions of Robert Ramsey's Affidavit that explain the reasons for the omissions in the credit files (Doc. # 71). This motion is due to be denied as moot because, even assuming the truth of the omissions without regard to Sterling's explanations, they do not establish pretext.

nancial Corporation of Alabama, and against Plaintiff Nash J. Cooley.

Costs are taxed against the Plaintiff.